FILED
COURT OF APPEALS
DIVISION II

2013 SEP 20 AM 9: 56

STATE OF WASHINGTON

BY_____
        DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 41689-1-II (Consolidated) |
| Respondent. | |
| v. | PUBLISHED OPINION |
| EDDIE DAVIS, | |
| Appellant. | |
| STATE OF WASHINGTON, | No. 41714-6-II |
| Respondent, | |
| v. | |
| DOUGLAS DAVIS, | |
| Appellant. | |
| STATE OF WASHINGTON, | No. 41739-1-II |
| Respondent, | |
| v. | |
| LETRICIA NELSON, | |
| Appellant. | |

BJORGEN, J. — Eddie Davis appeals from his jury convictions for first degree rendering criminal assistance, second degree unlawful possession of a firearm, and possession of a stolen firearm; Douglas Davis appeals from his jury convictions for first degree unlawful possession of a firearm and possession of a stolen firearm; and Letricia Nelson appeals from her jury convictions for first degree rendering criminal assistance and possession of a stolen firearm. They argue that (1) sufficient evidence does not support the unlawful possession and possession of a stolen firearm convictions; (2) their exceptional sentences lack both a legal and factual basis;

and (3) the trial court erred when it failed to note in a written order or on their judgments that certain counts against them had been dismissed. In his RAP 10.10 statement of additional grounds, Douglas[1] also contends that the trial court's unanimity instruction regarding the special verdict forms erroneously informed the jury of the law.

In summary, we hold that (1) sufficient evidence supported Eddie's convictions for unlawful possession of a firearm and possession of a stolen firearm, as well as Nelson's conviction for possession of a stolen firearm; (2) sufficient evidence did not support Douglas's unlawful possession of a firearm and possession of a stolen firearm convictions; (3) the exceptional sentences imposed under RCW 9.94A.535(3)(r) for Eddie's and Nelson's rendering of criminal assistance convictions were legally and factually justified; (4) sufficient evidence did not support the jury's application of the aggravating circumstance of RCW 9.94A.535(3)(r) to Eddie's unlawful possession of a firearm and possession of a stolen firearm convictions or to Nelson's possession of a stolen firearm conviction; (5) the law enforcement victim aggravating factor under RCW 9.94A.535(3)(v) is legally inapplicable to Eddie's and Nelson's convictions for rendering criminal assistance and unlawful possession of a firearm; (6) sufficient evidence did not support the jury's finding that the law enforcement victim aggravating factor applied to Eddie's and Nelson's convictions for possession of a stolen firearm; (7) the appellants did not demonstrate any error in their judgments regarding dismissed or consolidated counts; and (8) the trial court's unanimity instruction was not erroneous.

We affirm Eddie's and Nelson's convictions. We reverse Douglas's unlawful possession of a firearm and possession of a stolen firearm convictions and remand for dismissal of those

---

[1] For clarity, we refer to Douglas Davis and Eddie Davis by their first names. We intend no disrespect.

2

convictions with prejudice. We also remand for resentencing of Eddie and Nelson consistently with this opinion.

## FACTS

On the morning of Sunday, November 29, 2009, just before 8:00 AM, City of Lakewood Police Officers Tina Griswold, Ronald Owens, and Greg Richards, as well as Sergeant Mark Renninger, were in a Parkland coffee shop. Maurice Clemmons entered the coffee shop with two hand guns and, without warning, fatally shot Officer Griswold and Sergeant Renninger. After one of his guns jammed, Clemmons switched guns and shot Officer Owens, killing him. Officer Richards began to struggle with Clemmons and shot him once in the right side of his back. Clemmons then gained control of Officer Richards's duty firearm, fatally shot him with it, and left the scene.

Witnesses observed Clemmons get into the passenger side of a truck near the shootings, which then drove away. Shortly thereafter, investigators located the truck and linked Clemmons to the murders. As a result, they began to interview his friends and family in order to locate him. Over the course of multiple interviews, the details below emerged regarding Clemmons's activities after the murders.

Defendant Douglas was Clemmons's friend and employee. He lived with defendant Eddie, Clemmons's cousin and employee. In an interview with the Pierce County Sheriff's Department, Douglas said that on the morning of November 29 he was sleeping when he heard Clemmons beating on the door. Clemmons was armed with a silver 9mm semiautomatic handgun. He told Douglas to "[c]ome on" and they drove to a house in Auburn, a trip taking about 30 minutes. 10 Report of Proceedings (RP) at 1084, 1087. The evidence indicates that at

3

some point during their stay at the Auburn house, Douglas knew that Clemmons had killed the police officers. While at the Auburn house, Douglas treated Clemmons's wound with peroxide. Douglas saw Clemmons with the gun at the Auburn house and was "pretty sure" Clemmons took the gun with him when he left. 10 RP at 1086. Clemmons also "took a bag with his clothes in it" and "had different clothes on" when he left the Auburn house. 10 RP at 1110. Clemmons told Douglas to follow him, so Douglas followed him to a Discount Tire location and an apartment, where Clemmons left with a young woman.

Defendant Eddie was also interviewed by the Pierce County Sheriff's Department. In that interview, Eddie recounted that on the morning of November 29, Clemmons came to his residence and told Eddie to take him to Auburn. Eddie drove his car, a white Bonneville, to a house in Auburn with Clemmons in the back seat. En route to the house, Clemmons said that he had been shot while killing four police officers. Eddie saw the wound at the Auburn house and described it as not being serious. While at the house, Clemmons discarded a black jacket, had his wound treated with peroxide and bandaged, and received a change of clothes. Eddie then took Clemmons in the white Bonneville to a Discount Tire location at the Auburn SuperMall[2] and left.

Cicely Clemmons[3] is the cousin of Clemmons and Eddie and is the daughter of defendant Nelson. Nelson is defendant Clemmons's aunt. Cicely was interviewed by a City of Tacoma detective multiple times, including at Nelson's residence. According to the detective, Nelson's

---

[2] The Auburn SuperMall was recently renamed The Outlet Collection Seattle.

[3] For clarity we refer to Cicely Clemmons by her first name. We intend no disrespect.

residence was "fairly small" with a "fairly open floor plan" between the kitchen and living room. Cicely also testified at trial. 6 RP at 493.

Cicely stated that on the morning of November 29 she was in her bedroom at Nelson's residence when she heard someone "knock" on the front door. 6 RP at 283, 304, 306-07. After Nelson let Clemmons in the house, Clemmons said that he had just killed four police officers and had been shot, and asked Nelson to get him a shirt and a "plastic bag or something." 6 RP at 307. While still in her bedroom, Cicely heard Clemmons tell Eddie to call someone and tell someone to "tie it tight." 6 RP at 308.

Cicely went into the living room, where she saw Eddie and Douglas. Cicely asked Clemmons what had happened, and he told her he had killed four police officers and that he had taken the gun of one of the officers and killed him with it. Clemmons then gestured for her to give her car keys to Eddie, which she did. Cicely stated that, at Clemmons's direction, Eddie called "Quiana" whom he told to meet Clemmons at the SuperMall.

Cicely testified also that when she went into the living room, she saw a Tommy Hilfiger brand bag with some clothes in it on a counter. When Clemmons was ready to leave, he asked, "Where's the gun?" 6 RP at 316. Eddie replied that the gun was on the counter in the bag and got the gun for Clemmons. Eddie, Douglas, and Clemmons then left in two cars, Eddie's white Bonneville and Cicely's car, although Cicely did not know whether Clemmons left in the same car as Eddie or Douglas. Eddie and Douglas came back without Clemmons about five minutes later.

In an interview with the Tacoma detective, defendant Nelson stated that on the morning of November 29, Clemmons knocked on her door and told her he had been shot. Inside her

home, Nelson gave Clemmons some clothing and peroxide at his request, but did not treat his wound. Nelson also admitted that she retrieved the Tommy Hilfiger bag for Clemmons and put the gun inside it. Finally, she stated that Clemmons had arrived at her house in a white car, but left in Cicely's car to "meet somebody at the mall or something." 10 RP at 1177.

On the morning of December 1, 2009, Clemmons encountered a Seattle police officer and attempted to pull a gun from his sweatshirt. The officer opened fire, killing Clemmons. The gun Clemmons attempted to draw was Officer Richards's duty firearm.

The defendants were charged with various crimes, some of which were dismissed or consolidated. By the time instructions were submitted to the jury, each defendant had remaining one count of first degree rendering criminal assistance, one count of unlawful possession of a firearm (except for Nelson), and one count of possession of a stolen firearm.

The jury found Eddie guilty of one count of first degree rendering criminal assistance, one count of second degree unlawful possession of a firearm, and one count of possession of a stolen firearm. The jury acquitted Douglas of first degree rendering criminal assistance, but found him guilty of one count of first degree unlawful possession of a firearm and one count of possession of a stolen firearm. Finally, the jury convicted Nelson of one count each of first degree rendering criminal assistance and possession of a stolen firearm.

Eddie, Douglas, and Nelson appeal.

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE SUPPORTING FIREARM POSSESSION

Eddie, Douglas, and Nelson argue that sufficient evidence does not support their convictions for possession of a stolen firearm, and Eddie and Douglas argue that sufficient evidence does not support their convictions for unlawful possession of a firearm. Each argument is based on the claim that the individual in fact never possessed Richards's stolen duty firearm. We hold that sufficient evidence supports Nelson's stolen firearm possession conviction and Eddie's convictions for unlawful possession of a firearm and stolen firearm possession, but that sufficient evidence does not support Douglas's convictions for unlawful possession of a firearm and stolen firearm possession.

A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn from it. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Sufficient evidence supports a conviction if, when viewed in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime proved beyond a reasonable doubt. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). On appeal, we draw all reasonable inferences from the evidence in favor of the State and interpret them most strongly against the defendant. *Hosier*, 157 Wn.2d at 8. In the sufficiency context, we consider circumstantial evidence as probative as direct evidence. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). We may infer specific criminal intent of the accused from conduct that plainly indicates such intent as a matter of logical probability. *Goodman*, 150 Wn.2d at 781. We defer to the fact finder on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970

7

No. 41689-1-II (Cons. w/ No. 41714-6-II
   And No. 41739-1-II)

(2004), *abrogated in part on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

A person commits first degree unlawful possession of a firearm when "the person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted . . . of any serious offense as defined in this chapter." RCW 9.41.040(1)(a).[4] A person commits second degree unlawful possession of a firearm when the person "owns, has in his or her possession, or has in his or her control any firearm," under specified circumstances not including conviction of a serious offense. RCW 9.41.040(2)(a).

A person commits possession of a stolen firearm when "he or she possesses, carries, delivers, sells, or is in control of a stolen firearm." RCW 9A.56.310(1). The statute defines "possessing stolen property" as

> knowingly to receive, retain, possess, conceal, or dispose of stolen property knowing that it has been stolen and to withhold or appropriate the same to the use of any person other than the true owner or person entitled thereto.

RCW 9A.56.140(1). This definition applies to the crime of possession of a stolen firearm. RCW 9A.56.310(4).

Possession may be actual or constructive. *State v. Callahan*, 77 Wn.2d 27, 29, 459 P.2d 400 (1969). "A defendant has actual possession when he or she has physical custody of the item and constructive possession if he or she has dominion and control over the item." *State v. Jones*, 146 Wn.2d 328, 333, 45 P.3d 1062 (2002). Dominion and control over an object "means that the object may be reduced to actual possession immediately," *Jones*, 146 Wn.2d at 333, but

---

[4] The 2009 version of former RCW 9.41.040 (2009) applied on November 29 and 30, 2009, the dates the appellants committed their crimes. However, we cite the current version because it is gender neutral and substantively the same.

8

dominion and control need not be exclusive. *State v. Cote*, 123 Wn. App. 546, 549, 96 P.3d 410 (2004). Mere proximity, however, is not enough to establish possession. *Jones*, 146 Wn.2d at 333.

To determine whether a defendant had constructive possession of a firearm, we examine the totality of the circumstances touching on dominion and control. *State v. Jeffrey*, 77 Wn. App. 222, 227, 889 P.2d 956 (1995); *see also State v. Mathews*, 4 Wn. App. 653, 656, 484 P.2d 942 (1971). Dominion and control over premises raises a rebuttable presumption of dominion and control over objects in the premises. *State v. Cantabrana*, 83 Wn. App. 204, 208, 921 P.2d 572 (1996); *State v. Tadeo-Mares*, 86 Wn. App. 813, 816, 939 P.2d 220 (1997). A vehicle is considered a type of premises for purposes of determining constructive possession. *State v. Turner*, 103 Wn. App. 515, 521, 13 P.3d 234 (2000).

In addition to the ability to take immediate possession, we may consider other factors indicating dominion and control, such as the ownership of the item or the defendant's ability to exclude others from possessing it. *See State v. Partin*, 88 Wn.2d 899, 906, 567 P.2d 1136 (1977); *Callahan*, 77 Wn.2d at 31; *State v. Wilson*, 20 Wn. App. 592, 596, 581 P.2d 592 (1978). The cumulative effect of a number of these factors strongly indicates dominion and control, and, thus, constructive possession.[5] *Partin*, 88 Wn.2d at 906.

---

[5] Jury instruction 20, which was identical to 11A *Washington Practice: Washington Pattern Jury Instructions: Criminal* § 133.52, at 617 (3d ed. 2008) (WPIC) stated that "whether the defendant had the immediate ability to take actual possession of the item" is a nonexclusive factor of dominion and control, rather than the definition of the term. Clerk's Papers (CP) at 717. This is consistent with the cases here cited and with the analysis we employ in resolving this appeal.

9

No. 41689-1-II (Cons. w/ No. 41714-6-II
    And No. 41739-1-II)

1.    Nelson's Possession of a Stolen Firearm

Nelson does not dispute that she knew the firearm was stolen while it was present in her residence. Citing *Callahan*, however, she argues that sufficient evidence does not support finding that she actually or constructively possessed Richards's firearm, because she only had "fleeting possession" of it. Br. of Appellant (Nelson) at 7-11.

The *Callahan* court held that the evidence before it was insufficient to establish actual possession of drugs, stating

> [t]here was no evidence introduced that the defendant was in physical possession of the drugs other than his close proximity to them at the time of his arrest and the fact that the defendant told one of the officers that he had handled the drugs earlier. Since the drugs were not found on the defendant, the only basis on which the jury could find that the defendant had actual possession would be the fact that he had handled the drugs earlier and such actions are not sufficient for a charge of possession since *possession entails actual control, not a passing control which is only a momentary handling.*

*Callahan*, 77 Wn.2d at 29 (emphasis added). The court also held that the evidence was insufficient to support constructive possession, because it did not establish the defendant's dominion and control over the houseboat or, ultimately, the drugs. *Callahan*, 77 Wn.2d at 31-32.

Subsequently, our Supreme Court clarified the *Callahan* court's reference to "passing control" of an object:

> *Callahan* did not create a legal excuse for possession based on the duration of the possession. Rather, evidence of brief duration or "momentary handling" goes to the question of whether the defendant had "possession" in the first instance. *Depending on the total situation, a "momentary handling," along with other sufficient indicia of control over the drugs, may actually support a finding of possession.*

*State v. Staley*, 123 Wn.2d 794, 802, 872 P.2d 502 (1994) (emphasis added).

10

In contrast to *Callahan*, Nelson had dominion and control over her own residence. This allowed the jury to infer that she had dominion and control over the stolen firearm while it was in her residence. *Cantabrana*, 83 Wn. App. at 208. Further, Nelson actually possessed the firearm by picking it up, putting it in the Tommy Hilfiger bag, and putting the bag on a counter. Thus, she had physical custody of the firearm, which is the definition of actual possession found in *Jones*, 146 Wn.2d at 333. In addition, she stowed and made the firearm available for Clemmons's use, actions with profound criminal purpose and which by their nature only took a very short time. Although her possession was of short duration, this evidence is sufficient to establish actual possession of the firearm, reading *Callahan* and *Staley* together.

In addition, we note that this evidence is also sufficient to establish constructive possession of the firearm, even if her handling of it were deemed too momentary to constitute actual possession. In *State v. Summers*, 107 Wn. App. 373, 386-87, 28 P.3d 780, 43 P.3d 526 (2001), we held that "evidence of momentary handling, when combined with other evidence, such as dominion and control of the premises, or a motive to hide the item from police, is sufficient to prove possession." *See also Staley*, 123 Wn.2d at 802. As noted, Nelson's dominion and control over the gun did not have to be exclusive to establish constructive possession. Here, Nelson had dominion and control over her own residence, establishing a rebuttable presumption that she had dominion and control over the stolen firearm while it was in her residence under *Cantabrana*. She picked the gun up, put it in the Tommy Hilfiger bag, and put the bag on a counter. She not only had the ability to reduce the gun to her immediate possession, but actually did so. Under the case law above, this establishes the dominion and control necessary for constructive possession.

11

The evidence is sufficient to support Nelson's conviction of possession of a stolen firearm.

2.     Eddie's Unlawful Possession of a Firearm and Possession of a Stolen Firearm

As noted, Eddie was convicted of unlawful possession of a firearm and possession of a stolen firearm. He stipulated at trial to a prior qualifying conviction necessary to prove second degree unlawful possession of a firearm. However, citing *Callahan*, *State v. Spruell*, 57 Wn. App. 383, 788 P.2d 21 (1990), and *Cote*, he argues that the evidence demonstrates only his proximity to and momentary handling of the firearm and, thus, insufficiently establishes that he possessed it for purposes of either unlawful possession of a firearm or possession of a stolen firearm.[6] We hold that the evidence is sufficient to support both convictions on the basis of Eddie's actual and constructive possession of the firearm while at Nelson's residence.

The evidence established that at her residence Nelson put the firearm in the Tommy Hilfiger bag and put the bag on a counter. When he was ready to leave, Clemmons asked, "Where's the gun?" and Eddie replied that the gun was on the counter in the bag and handed the bag to Clemmons. Thus, the evidence definitively established Eddie's knowledge of the presence and location of the gun, and the jury could rationally infer that Eddie was standing in close proximity to the counter and, thus, the gun. In addition to Eddie's knowledge and proximity, he exercised at least passing control over the bag and, thus, the gun, when he handed the bag to Clemmons. Moreover, unlike *Callahan*, here no one claimed ownership or even

---

[6] Although Clemmons told Eddie during that drive that he had killed four police officers, the evidence does not reflect that Clemmons told anyone that he had taken the firearm from Officer Richards until Cicely asked him while at Nelson's residence what had happened. Thus, the evidence is sufficient to show that Eddie knew the gun was stolen when he handled it at the residence.

12

exclusive possession of the gun, weighing in favor of at least shared dominion and control. In sum, the cumulative weight of this evidence was sufficient to establish that Eddie could immediately reduce the gun to his actual possession, thereby exercising dominion and control over it and constructively possessing it. *See Jones*, 146 Wn.2d at 333; *Partin*, 88 Wn.2d at 906.

The evidence also shows that Eddie actually possessed the firearm when he picked up the Tommy Hilfiger bag, which he knew contained the weapon, and handed it to Clemmons, who had just asked for the gun. Thus, Eddie had physical custody of the firearm, which is the definition of actual possession found in *Jones*, 146 Wn.2d at 333. Although of short duration, this evidence is sufficient to establish actual possession of the firearm consistently with *Callahan* and *Staley* under the reasoning applicable to Nelson's possession discussed above.

Whether viewed as actual or constructive possession, the evidence is sufficient to support Eddie's convictions of possession of a stolen firearm and unlawful possession of a firearm.

3.    Douglas's Unlawful Possession of a Firearm and Possession of a Stolen Firearm

Douglas argues under *Callahan*, *Spruell*, *Cote*, and *State v. Enlow*, 143 Wn. App. 463, 178 P.3d 366 (2008), that the evidence established only his proximity to Officer Richards's gun. We agree and conclude that the evidence is insufficient to establish that Douglas either actually or constructively possessed the firearm. Accordingly, the evidence is insufficient to support his convictions for unlawful possession of a firearm and possession of a stolen firearm.

The analyses in prior decisions are helpful in identifying the contours of constructive possession. In *Spruell*, 57 Wn. App. at 384, while searching a house, the police found the defendant in the kitchen and cocaine on a plate that had his fingerprint on it. The court held under those facts that the defendant's proximity to the drugs was not enough to establish his

13

dominion and control for purposes of constructive possession. *Spruell*, 57 Wn. App. at 388-89. In *Cote*, 123 Wn. App. at 548, the police found components of a methamphetamine lab when they searched a stolen truck in which the defendant had been a passenger. The defendant's fingerprints were found on two mason jars in the truck containing various chemicals. *Cote*, 123 Wn. App. at 548. The court held that because the evidence demonstrated only that Cote "was at one point in proximity to the contraband and touched it," the evidence was insufficient to establish dominion and control and, thus, constructive possession. *Cote*, 123 Wn. App. at 550. *Enlow* presented a similar situation. Law enforcement officers searching a truck discovered methamphetamine and the materials used to make it and found Enlow hiding under a blanket in the truck's canopy. *Enlow*, 143 Wn. App. at 466. Because Enlow did not own the truck or live at the address and because there was no evidence that he had even momentarily touched the methamphetamine or the materials to manufacture it, the court held that the evidence was insufficient to establish his constructive possession of the contraband. *See Enlow*, 143 Wn. App. at 469-70. Finally, in *Turner*, 103 Wn. App. at 518, law enforcement officers discovered a rifle inside a partially opened bow case on the back seat behind the driver's seat in Turner's truck. This court held that sufficient evidence established Turner's constructive possession of the rifle, including his dominion and control over his truck, his proximity to the rifle, the extended duration of time the rifle was in his truck, and Turner's lack of objection to the firearm's presence in his truck. *Turner*, 103 Wn. App. at 524.

Here, the State appears to argue that Douglas at least constructively possessed the gun during the drive to Nelson's residence. Br. of Resp't. at 28. As discussed above, the jury could infer that both Douglas and the gun were present in Eddie's car during this drive. Although the

14

facts do not establish where Douglas sat in the car, the jury might further infer that he was near the gun. However, like the defendants in *Callahan, Spruell, Cote,* and *Enlow,* Douglas did not have dominion and control over the car; the car was owned and driven by Eddie. No other evidence suggests that Douglas had the ability while in the car to immediately reduce the gun to his actual possession, which is a central criterion of constructive possession. *See Jones,* 146 Wn.2d at 333. Because proximity alone is not enough to establish constructive possession, *Jones,* 146 Wn.2d at 333, the evidence is insufficient to establish that Douglas constructively possessed the firearm while in the car. Therefore, the evidence of what occurred in the car is insufficient to support his convictions for unlawful possession of a firearm or possession of a stolen firearm.

Turning to the events in Nelson's residence, the State argues that Douglas constructively possessed the gun while it was in the bag on the counter because "anyone" could have taken possession of it. Br. of Resp't at 29. As discussed above, the jury could have inferred that Douglas was in close proximity to the bag, as he was close to Eddie and Clemmons while Eddie called Quiana. As noted, however, proximity alone is not enough to establish constructive possession. *Jones,* 146 Wn.2d at 333. Like the defendants in *Callahan, Spruell, Cote,* and *Enlow,* Douglas did not have dominion and control over Nelson's residence. As in *Enlow,* there was no evidence suggesting that Douglas even momentarily handled the gun while in Nelson's residence. Apart from proximity, no evidence suggested that Douglas had dominion and control over the firearm at Nelson's residence. Therefore, under *Jones,* the evidence was insufficient to establish that Douglas ever constructively possessed the firearm.

15

The State also argues in the following passage that Douglas actually possessed the gun while treating Clemmons's wound:

> As Douglas . . . was the one attending [Clemmons's] wounds . . . he would have been in close proximity to the gun and it is reasonable to infer that he would be the one to take the gun from [Clemmons] so that it would not accidentally discharge while he was treating [Clemmons's] wounds.

Br. of Resp't at 29.

In a sufficiency challenge the State is entitled only to *reasonable* inferences that can be drawn from the evidence. *See Salinas*, 119 Wn.2d at 201. The record does not reveal the gun's location between the time Clemmons entered Nelson's residence and the time Nelson put the gun in the Tommy Hilfiger bag. Nor does the record show whether Clemmons still actually possessed it when Douglas treated his wound. Thus, there is no basis for inferring that Clemmons gave the gun to Douglas at that point. The State's argument is mere speculation that falls short of a reasonable inference from the evidence.

The evidence is not sufficient to support Douglas's convictions of unlawful possession of a firearm and possession of a stolen firearm through the lens of either actual or constructive possession. We consequently reverse these convictions and, because double jeopardy bars retrial, remand for dismissal with prejudice, consistently with *State v. Hickman*, 135 Wn.2d 97, 103, 954 P.2d 900 (1998).

## II. EXCEPTIONAL SENTENCES

The defendants next challenge the exceptional sentences imposed under RCW 9.94A.535(3)(r) (destructive and foreseeable impact on persons other than the victim) and RCW 9.94A.535(3)(v) (offense against a law enforcement officer performing official duties). Before entering the legal analysis, we summarize additional facts relevant to these issues.

16

During an interview with Detective Quilio on November 30, 2009, Nelson claimed that she had not seen or spoken to Clemmons since Thanksgiving and had no information about the shootings. She also said she had not spoken to Eddie or Douglas. During a second interview with Detective Quilio on December 1, Nelson admitted to lying in her first interview and to assisting Clemmons. Detective Quilio testified that this information would have assisted the investigation had Nelson disclosed it during her first interview on November 30.

During his interview with detectives, Eddie initially claimed that he had not seen Clemmons since November 23. But, later in the interview, Eddie admitted to assisting Clemmons as described above. Similarly, during his interview with Detective Karr, Douglas first claimed he had not seen Clemmons since a week before the murders. Later in the interview, Douglas admitted to his interactions with Clemmons after the shootings. Detective Karr testified that it would have assisted the investigation had Douglas earlier disclosed that Clemmons had left with a young woman in Auburn; however, Douglas's initial withholding of details about Clemmons's wound and his still being armed did not affect the investigation because law enforcement already knew these details.

The testimony at trial described the shock of the search for Clemmons on the slain officers' families and its effect on law enforcement. Kim Renninger, Officer Renninger's widow, testified that because four officers had been killed and the killer was still at large, she was concerned for her and her children's safety and sought protection. When she heard Clemmons had taken one of the officers' guns, she felt "terrified." 5 RP at 242. One of Officer Richards's children testified that, because Clemmons had killed four officers and was still at large, she was "[s]cared that he was going to come for the family members or for us." 5 RP at

17

246. Knowing that Clemmons was at large with her father's gun had "more of an impact on how [she] felt." 5 RP at 247.

Pierce County Detective Sergeant Chris Adamson testified that he was not aware of any of Pierce County's approximately 50 detectives who did not participate in the investigation. Detective Quilio testified that six to seven City of Tacoma detectives were assigned to the investigation. According to King County Sheriff's Deputy Michael McDonald, the knowledge that Clemmons was "still at large and . . . possibly . . . helped" impacted the King County Sheriff's Department's daily operations; several King County law enforcement officials were assigned to assist in the investigation.

Detective Sergeant Kobel testified that the search for Clemmons was not a "regular shift type assignment" and "detectives were called out and [they] stayed with it literally until [they] dropped." 9 RP at 877, 882. Finally, City of Lakewood Assistant Chief Michael Zaro testified that the shootings caused a safety concern for officers and their families because Clemmons had specifically targeted police officers and was still at large. Extra officers were diverted to provide security to the slain officers' families. According to Assistant Chief Zaro, these concerns were magnified by the knowledge that people may have been aiding Clemmons. Had Clemmons been captured more quickly, the fears about him targeting officers would also have subsided more quickly.

For each count submitted to the jury, the State alleged two aggravating factors: first, that the offense involved a destructive and foreseeable impact on persons other than the victim (RCW

9.94A.535(3)(r)),[7] and second, that the offense was committed against a law enforcement officer (RCW 9.94A.535(3)(v)). Based on the testimony at trial, the jury found by special verdicts that the State had proven the existence of both aggravating factors for each conviction it returned against the defendants.

At sentencing, the trial court determined that Eddie's and Douglas's convictions for unlawful possession of a firearm and possession of a stolen firearm were required by law to run consecutively.[8] The trial court also found that the legislature did not consider either of the aggravating factors in establishing the standard sentencing range for any of the crimes and concluded that "substantial and compelling reasons" justified an exceptional sentence. Clerk's Papers (CP) at 466-67.

On these bases, the trial court imposed an exceptional sentence of 60 months on Eddie's first degree rendering conviction. It imposed another exceptional sentence by ordering the term on his rendering conviction to run consecutively to the statutorily-mandated 43-month and 22-month consecutive sentences on the unlawful possession of a firearm and possession of a stolen firearm convictions, for a total of 125 months' confinement.

---

[7] Former RCW 9.94A.535 (2008) applied to the events of November 29 and 30, 2009. However, because the legislature's subsequent amendments to this statute changed it to be gender neutral and made no substantive changes to the subsections discussed in this opinion, we apply the current statute.

[8] RCW 9.94A.589(1)(c) provides that if

an offender is convicted under RCW 9.41.040 for unlawful possession of a firearm in the first or second degree and for the felony crimes of theft of a firearm or possession of a stolen firearm, or both . . . [t]he offender shall serve consecutive sentences for each conviction of the felony crimes listed in this subsection (1)(c), and for each firearm unlawfully possessed.

19

For Douglas, the trial court imposed two exceptional sentences of 45 months each on his firearm convictions. The sentences ran consecutively as required by RCW 9.94A.589(1)(c) for a total of 90 months' confinement.

Finally, the trial court imposed an exceptional sentence of 60 months on Nelson's first degree rendering conviction and a standard range sentence of 14 months on her possession of a stolen firearm conviction. The trial court imposed an additional exceptional sentence on Nelson by ordering her sentences to run consecutively for a total of 74 months' confinement. The appellants now challenge the legal and factual bases for their exceptional sentences.

1.    Standard of Review

RCW 9.94A.585(4) sets out the standards for review of an exceptional sentence:

> To reverse a sentence which is outside the standard sentence range, the reviewing court must find:  (a) Either that the reasons supplied by the sentencing court are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard sentence range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.

RCW 9.94A.585(4)(a) has both a factual and a legal component. *State v. Stubbs*, 170 Wn.2d 117, 123, 240 P.3d 143 (2010).  A jury must find "any facts supporting aggravating circumstances beyond a reasonable doubt and by special interrogatory." *Stubbs*, 170 Wn.2d at 123.  We review the jury's factual findings under the sufficiency of the evidence standard. *Stubbs*, 170 Wn.2d at 123.  We review the trial court's legal justifications for an exceptional sentence de novo. *Stubbs*, 170 Wn.2d at 124.

2.     RCW 9.94A.535(3)(r): Destructive and Foreseeable Impact on Persons Other Than The Victim

   a. "Victim" of the Offenses

Under RCW 9.94A.535(3)(r), the trial court may impose an exceptional sentence when the jury finds "[t]he offense[s] involved a destructive and foreseeable impact on persons other than the victim." The appellants argue that, because Washington precedent defines the victim of rendering criminal assistance and unlawful possession of a firearm as the general public, RCW 9.94A.535(3)(r) does not apply as a matter of law. Specifically, they argue that if the victim of these crimes is the public, which consists of everyone, then there cannot be someone "other" than the victim as RCW 9.94A.535(3)(r)'s plain language requires. Br. of Appellant (Eddie) at 23-26. We disagree.

We review questions of statutory interpretation de novo by ascertaining the Legislature's intent. *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005). Where a statute's meaning is plain on its face, we give effect to that meaning as expressing the intent of the legislature. *Jacobs*, 154 Wn.2d at 600. We determine the statute's plain meaning from the ordinary meaning of its language, as well as from the statute's general context, related provisions, and the statutory scheme as a whole. *Jacobs*, 154 Wn.2d at 600. Absent a specialized statutory definition, we give a term its plain and ordinary meaning ascertained from a standard dictionary. *State v. Watson*, 146 Wn.2d 947, 954, 51 P.3d 66 (2002). We interpret statutes to give effect to all language in the statute and to render no portion meaningless or superfluous. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003). We also interpret statutes to harmonize them whenever possible. *State v. Powell*, 167 Wn.2d 672, 695-96, 223 P.3d 493 (2009).

Our Supreme Court has held that the victim of unlawful possession of a firearm is the general public. *State v. Haddock*, 141 Wn.2d 103, 110-11, 3 P.3d 733 (2000). The appellants cite numerous cases from other jurisdictions holding that the victim of rendering criminal assistance (or the similar crime of accessory after the fact) is also the general public. *See, e.g., People v. Perry*, 218 Mich. App. 520, 534-35, 554 N.W.2d 362 (1996). The State accepts this view in its discussion of rendering criminal assistance by stating, "This crime . . . is a crime against society." Br. of Resp't at 45-46.

The Sentencing Reform Act (SRA),[9] however, contains its own definition of "victim." RCW 9.94A.030(53) defines "[v]ictim" as "any person who has sustained emotional, psychological, physical, or financial injury to person or property as a *direct result* of the crime charged." (Emphasis added.) Thus, RCW 9.94A.535(3)(r) allows for an exceptional sentence only if the offenses involved a "destructive and foreseeable impact" on persons other than those sustaining injury "as a *direct result* of the crime charged."

Although the SRA does not define "person," RCW 1.16.080 defines the term to include individuals, as well as political or corporate entities. *Black's Law Dictionary* defines "person," among other things, as "[a] human being." BLACK'S LAW DICTIONARY at 1257 (9th ed. 2009). Similarly, *Webster's Third New International Dictionary of the English Language* contains several relevant definitions of "person":

> 1. an individual human being
> . . . .
> 6. a human being, a body of persons, or a corporation, partnership, or other legal entity that is recognized by law as the subject of rights and duties
> . . . .

---

[9] Ch. 9.94A RCW.

8. a being characterized by conscious apprehension, rationality, and a moral sense
9. a living individual unit

WEBSTER'S THIRD NEW INT'L DICTIONARY at 1686 (2002).

A common thread in these entries is the definition of a person as a discrete, identifiable individual or group entity, as opposed to the inchoate mass of society as a whole. Under these definitions, even when the victim of the underlying crime is considered to be society as a whole, aggravating circumstances exist under the terms of RCW 9.94A.535(3)(r) when the evidence demonstrates a destructive and foreseeable impact on a *specific* individual or entity. This view is also consistent with RCW 9.94A.030(53)'s definition of "victim," since society *qua* society may be directly injured by certain crimes which have an indirect or secondary, but nonetheless "destructive and foreseeable," effect on specific individuals. The crime of rendering criminal assistance brightly illustrates this situation. It directly damages society as a whole by compromising those processes at the heart of ordered liberty. It may also, in certain circumstances, touch specific individuals in ways beyond its general societal effect. If "destructive and foreseeable," those effects are aggravating circumstances under the terms of RCW 9.94A.535(3)(r).

Were we to accept the appellants' interpretation that "persons" and "society" are one and the same, we would render the aggravator meaningless for these crimes, an interpretation to be avoided under *J.P.*, 149 Wn.2d at 450. On the other hand, applying RCW 9.94A.535(3)(r) to the crimes of rendering criminal assistance and unlawful possession of a firearm when there exists a destructive and foreseeable impact on specific individuals or entities is consistent with both the

23

definitions of "person" and "victim" noted above. In the absence of any exception for these crimes in RCW 9.94A.535(3)(r), this interpretation of the statute best serves legislative intent.

b. Nature of the Impact from Rendering Criminal Assistance

Nelson argues that the destructive and foreseeable aggravator of RCW 9.94A.535(3)(r) was inapplicable to her rendering conviction because the effects of that crime were factors the Legislature necessarily considered in setting the standard range. Similarly, Eddie and Nelson argue that the destructive and foreseeable aggravating circumstance is inapplicable because the impact of their rendering criminal assistance was not of "such a distinctive nature that it is not normally associated with the commission of the offense." Br. of Appellant (Eddie) at 28-30; Br. of Appellant (Nelson) at 11.

When an aggravating factor is used to enhance punishment, it "'must take into account factors other than those which are necessarily considered in computing the presumptive range for the offense.'" *State v. Chadderton*, 119 Wn.2d 390, 395, 832 P.2d 481 (1992) (quoting *State v. Nordby*, 106 Wn.2d 514, 518, 723 P.2d 1117 (1986)). This means that factors inherent in the crime cannot justify an exceptional sentence.

The State argues that the assistance which Eddie and Nelson extended to Clemmons had a destructive and foreseeable impact on law enforcement. This crime, however, already takes into account the effect on law enforcement. Specifically, the statute criminalizes acts which "prevent, hinder, or delay the apprehension" of the principal. RCW 9A.76.050.[10] This duplicates the destructive and foreseeable impact argued by the State, that the assistance which Eddie and Nelson extended to Clemmons prolonged his apprehension. *See also United States v.*

---

[10] Former RCW 9A.76.050 (1982) applied to the dates of the appellants' crimes. For the reasons stated above, we apply the current statute.

*Brenson*, 104 F.3d 1267, 1286 (11th Cir. 1997) ("'The gist of being an accessory after the fact lies essentially in obstructing justice by rendering assistance to hinder or prevent the arrest of the offender after he has committed the crime.'") (quoting *United States v. Huppert*, 917 F.2d 507, 510 (11th Cir. 1990). Thus, under *Chadderton* the delays and extra burdens on law enforcement caused by this assistance are inherent in the crime and cannot justify an exceptional sentence.

The State argues also that Eddie's and Nelson's assistance to Clemmons had a destructive impact on the public. As discussed above, though, the general public is the victim of rendering criminal assistance. Thus, the legislature necessarily considered this type of impact on the public in setting the standard range for this crime.

The State argues further that Eddie's and Nelson's assistance had a destructive impact on the families of the slain officers. The *Chadderton* Court's analysis of another aggravating circumstance is helpful in determining whether the effect on the surviving families may sustain an exceptional sentence under RCW 9.94A.535(3)(r). Chadderton was convicted of manslaughter for the death of a nursing home resident under his care. The Court held that the victim's vulnerability could be an aggravating circumstance, since it was "not a factor of the sort the Legislature necessarily considered in setting the standard sentence range for first degree manslaughter." *Chadderton*, 119 Wn.2d at 396. In reaching this conclusion, the Court noted prior decisions holding that the extreme youth of a victim may serve as an aggravating factor for statutory rape or indecent liberties, that the particular vulnerability of foreigners to a robber's demands may justify an enhanced sentence for robbery, and that the vulnerability of a stranded motorist may serve as an aggravating factor for the crime of rape. *Chadderton*, 119 Wn.2d at 396.

25

Thus, although crimes such as rape, robbery and manslaughter may be committed against anyone, the legislature did not necessarily consider the vulnerability of specific victims when setting the standard range. Here, the knowledge that Clemmons had murdered four officers and was still at large had a destructive emotional impact on the slain officers' families. Kim Renninger and Officer Richards's daughter testified that they feared Clemmons would target them or the rest of their families. Although Eddie and Nelson themselves did not murder the four officers, their actions in helping Clemmons evade apprehension lengthened this destructive impact on the officers' families. Consistently with *Chadderton*, there is no indication we find in the statute or otherwise that this sort of effect was necessarily considered in computing the presumptive range for rendering criminal assistance. On the contrary, the nature of the "victim" of the crime of rendering assistance, discussed above in part II.B.i., above, signals that these effects on specific individuals were not considered for this purpose.

A separate but related requirement is that a destructive and foreseeable impact justifying an exceptional sentence must be of a "destructive nature that is not normally associated with the commission of the offense in question." *State v. Cuevas-Diaz*, 61 Wn. App. 902, 906, 812 P.2d 883 (1991). For example, in *State v. Johnson*, 69 Wn. App. 528, 539, 849 P. 2d 662 (1993), Division One of this court held that a gang related shooting in front of an elementary school that was in session was sufficiently distinctive in nature from the normal circumstances of first or second degree assault to uphold the aggravating factor. In that case, the trial court heard evidence that many of the children were afraid to go to school after the shooting and that the parents were afraid their children were not safe while at school. *Johnson*, 69 Wn. App. at 539.

26

Similarly, in *State v. Jackson*, 150 Wn.2d 251, 276, 76 P.3d 217 (2003), our Supreme Court upheld an enhanced sentence where the defendant created a story to cover up his murder of his daughter. The Court reasoned that where a person disappears, as the victim did here, it was normal for the police and community to expend extra resources in searching for the victim; thus this could not be the basis of upholding the aggravating factor. *Jackson*, 150 Wn.2d at 275. The court reasoned also that the effect on the children at the victim's elementary school justified the enhancement, since the evidence showed that parents would not allow children to walk to school alone, the principal personally walked children home, many children had nightmares, and their school performance declined. *Jackson*, 150 Wn.2d at 276.

In *Cuevas-Diaz*, 61 Wn. App. at 903, the defendant broke into the victim's house and sexually assaulted her. After the victim broke away from her attacker, the defendant followed her to her children's room, where the victim screamed at the defendant. *Cuevas-Diaz*, 61 Wn. App. at 903. We rejected the trial court's holding that this had a foreseeable and destructive impact on the community generally, especially single mothers in the area. *Cuevas-Diaz*, 61 Wn. App. at 905. We recognized that the crime had an effect on the community, but that the impact was foreseeable and exists in any case. *Cuevas-Diaz*, 61 Wn. App. at 905. However, we upheld the aggravating factor based on the trial court's finding that the commission of the crime in front of the children severely traumatized them, which is distinguishable from other assaults of a similar nature. *Cuevas-Diaz*, 61 Wn. App. at 905-06.

In general, rendering assistance to a murderer, thus delaying his apprehension, will necessarily prolong the emotional anguish of the victim's family. The evidence here, though, demonstrated much more: that the slain officers' families particularly feared that they might also

27

be Clemmons's targets, since he had specifically murdered four police officers. Eddie and

Nelson prolonged this fear by rendering criminal assistance to Clemmons. Accordingly, their

actions caused a destructive impact on the slain officers' families not normally associated with

the underlying crime.

c. Sufficiency of the Evidence

Finally, the appellants argue that sufficient evidence did not support finding that their

crimes of rendering criminal assistance, unlawful possession of a firearm, and possession of a

stolen firearm caused a destructive and foreseeable impact on persons other than the victim.

None of the appellants challenge whether the impacts argued by the State were foreseeable.

Thus, we focus on whether the evidence is sufficient to show a destructive impact.

As discussed above, the destructive impact on the slain officers' families was a legally

justifiable basis for imposing an exceptional sentence. As noted above, Kim Renninger and

Officer Richards's daughter testified to the fear caused by their knowledge that Clemmons was

still at large, and Eddie and Nelson prolonged that fear by aiding Clemmons in evading capture.

Accordingly, sufficient evidence supports finding that the assistance Eddie and Nelson rendered

had a destructive impact on the officers' families. The imposition of an exceptional sentence for

these convictions under RCW 9.94A.535(3)(r) was justified under the law.

The same, however, cannot be said for Eddie's and Nelson's crimes of unlawfully

possessing a firearm and possessing a stolen firearm. The slain officers' family members and

law enforcement officers testified about the fear, concern, and other emotional impacts caused by

the knowledge that Clemmons, the officers' murderer, was still at large and armed, particularly

with Officer Richards's gun. But the impact caused by Clemmons's unlawful possession of this

28

particular stolen firearm while at large cannot be imputed to Eddie's and Nelson's possession.

Neither was an accomplice to the murders and, apart from their rendering criminal assistance, their possession of Officer Richards's gun did nothing to cause a prolonged fear of Clemmons being armed with the same gun. Accordingly, sufficient evidence does not support finding that their crimes of unlawful possession and stolen possession of a firearm caused a destructive impact on anyone other than the victim. The imposition of an exceptional sentence for these convictions was not justified under RCW 9.94A.535(3)(r).

3.    RCW 9.94A.535(3)(v): Offenses Against Law Enforcement Officers

       a. Application of RCW 9.94A.535(3)(v)

Under RCW 9.94A.535(3)(v), the trial court may impose an exceptional sentence when the jury finds that

> [t]he offense was committed against a law enforcement officer who was performing his or her official duties at the time of the offense, the offender knew that the victim was a law enforcement officer, and the victim's status as a law enforcement officer is not an element of the offense.

The public is the victim of the crimes of rendering criminal assistance and unlawful possession of a firearm. RCW 9.94A.535(3)(r) authorizes imposition of an exceptional sentence for a destructive and foreseeable impact on "persons other than the victim," thus encompassing specific individuals and entities, such as the slain officers' families, whose circumstances distinguish them from the inchoate public. In contrast, RCW 9.94A.535(3)(v) specifically requires that the offense be committed "*against a* law enforcement officer." (Emphasis added.)

Accordingly, by its plain language RCW 9.94A.535(v) does not apply to the crime of rendering criminal assistance or unlawful possession of a firearm in these circumstances. The State concedes that this aggravating factor is inapplicable to Eddie's and Nelson's conviction for

29

unlawful possession of a firearm. This aggravating circumstance, though, may apply to the crime of possession of a stolen firearm.

b. Sufficiency of the Evidence

Appellants contend that sufficient evidence does not support a finding that their offenses of rendering criminal assistance, unlawful possession of a firearm, and possession of a stolen firearm were committed against a law enforcement officer in the performance of his official duties. As discussed above, the law enforcement victim aggravator is legally inapplicable to the crimes of rendering and unlawful possession in these circumstances. Thus, we discuss only whether sufficient evidence sustains its application to the convictions for possession of a stolen firearm.

Our Supreme Court has held that the victim of possession of a stolen firearm is the rightful owner of the firearm. *Haddock*, 141 Wn.2d at 111. The State contends that the victim of the appellants' possession of Officer Richards's stolen gun was Officer Richards. Although Officer Richards was performing his official duties when Clemmons shot and killed him with his own service weapon, the evidence shows that Officer Richards was deceased by the time Eddie and Nelson possessed his gun.[11] Thus, Officer Richards cannot be considered to have been in performance of his "official duties" during that time. RCW 9.94A.535(3)(v). Accordingly, under this statute sufficient evidence does not support the jury's finding that Eddie's and

---

[11] This aggravator does not apply even if the true owner of the gun was the City of Lakewood Police Department. RCW 9.94A.535(3)(v) specifies that the crime must be committed against "*a* law enforcement officer," that is, an individual law enforcement officer. *See State v. Ose*, 156 Wn.2d 140, 146, 124 P.3d 635 (2005). The Lakewood Police Department is a composite governmental entity, not a single officer.

Nelson's possession of a stolen firearm was committed against a law enforcement officer in the performance of official duties.

The dissent points out that *Haddock* also held that "the unlawful possession of property taken in a theft is a mere continuation of the thief's act of depriving the true owner of his or her right to possess their property." *Haddock*, 141 Wn.2d at 112. From this, the dissent argues that the victim of possession of a stolen firearm is the same victim of the theft that originally deprived him or her of the firearm. Since the firearm was stolen from Officer Richards, the dissent concludes that Officer Richards is the victim of both the theft and any resulting possession of the stolen firearm, triggering application of the law enforcement victim aggravator.

*Haddock* is distinguishable because it dealt with whether certain acts constituted the same course of criminal conduct for purposes of calculating an offender score, and the dissent's logic is impeccable in that context. Here, however, we are concerned with the application of the "law enforcement" aggravator to the crimes of possession of a stolen firearm by Eddie and Nelson. This aggravator applies only if the "offense was committed against a law enforcement officer who was performing his or her official duties *at the time of the offense* . . . ." RCW 9.94A.535(3)(v) (emphasis added). Eddie and Nelson first possessed Richards's stolen gun after he was deceased. Thus, "at the time of the offense" Officer Richards was not performing his official duties, and this aggravator does not apply.

This reading will not lead to the absurdity posited by the dissent. If one stole an officer's firearm while the officer was on duty, and the other elements of RCW 9.94A.535(3)(v) were in place, the aggravator would apply. The officer's transition to off-duty status would not remove the aggravating circumstance from the theft when he was on duty. With high respect for our

31

colleague, we disagree with the dissent. The aggravating circumstance of RCW 9.94A.535(3)(v) does not apply to Eddie's and Nelson's convictions for possession of a stolen firearm.

4.    Summary of Holdings on the Exceptional Sentences

The exceptional sentences based on RCW 9.94A.535(3)(r) imposed on Eddie's and Nelson's convictions for rendering criminal assistance were legally and factually justified. Sufficient evidence, however, did not support the jury's application of the aggravating circumstance of RCW 9.94A.535(3)(r) to their unlawful possession of a firearm and possession of a stolen firearm convictions. Further, the law enforcement victim aggravating factor under RCW 9.94A.535(3)(v) is legally inapplicable to Eddie's and Nelson's convictions for rendering criminal assistance and unlawful possession of a firearm. We hold also that sufficient evidence did not support the jury's finding that this aggravator applied to their possession of a stolen firearm convictions.

## III. JUDGMENT AND SENTENCE

Eddie, Douglas, and Nelson argue that the trial court erred (1) when it did not indicate on their judgment and sentences that all but one count of rendering criminal assistance against each of them had been dismissed as a result of combining them into one count or (2) when it did not enter written orders dismissing those counts. Douglas further argues that the trial court should have noted on the judgment and sentence or entered a written order reflecting its oral dismissal of counts 1 and 2 against him for insufficiency of the evidence. Finally, Nelson argues that the trial court committed a scrivener's error when it indicated on her judgment and sentence that an exceptional sentence was imposed on both counts 1 and 5.

Before trial, the defendants moved to dismiss all but one of the remaining counts of first degree rendering charged against each of them. The trial court denied the motion, but ruled as a matter of law that the statute governing this crime, former RCW 9A.76.070 (2003), contains "one single unit of prosecution" consisting of "the course of conduct of obstructing the apprehension and prosecution [of the subject]" and that the crime "can be committed in multiple ways" enumerated in RCW 9A.76.050. Consistently with this ruling, the court instructed the jury on one count of rendering for each defendant, and the "to convict" instruction for each count listed alternative means of committing the offense that had been charged initially as the separate counts of that offense. The trial court also orally dismissed two of the rendering counts (counts 1 and 2) against Douglas for insufficiency of the evidence.

The jury found by special verdict form that Eddie had committed rendering under two of the listed alternative means, and that Nelson had committed rendering through one of the alternative means. As already noted, the jury acquitted Douglas of rendering criminal assistance.

The trial court sentenced Eddie and Nelson each for conviction of one count of rendering criminal assistance. All three defendants' judgment and sentence forms contained a line reading, "The court DISMISSES Counts" followed by a blank. CP at 472. The trial court did not write anything in these blanks. On Nelson's judgment and sentence, the trial court checked a box indicating that "[s]ubstantial and compelling reasons exist which justify an exceptional sentence . . . above the standard range for Count(s)" and wrote in counts 1 and 5. CP at 1632. No one objected to any of these actions by the trial court at sentencing.

Turning now to their claimed errors, the appellants cite *State v. Moten*, 95 Wn. App. 927, 976 P.2d 1286 (1999), and *State v. Ford*, 137 Wn.2d 472, 973 P.2d 452 (1999), for the

proposition that the trial court's failure to list its dismissal of counts on their judgment and sentences requires remand for correction. Those decisions, however, are distinguishable. In *Moten*, 95 Wn. App. at 929, the defendant's judgment listed an incorrect statutory reference to an offense. Division One of this court held that the incorrect statutory reference was a scrivener's error and remanded for its correction. *Moten*, 95 Wn. App. at 929. In *Ford*, 137 Wn.2d at 475-76, the trial court included out-of-state convictions in calculating Ford's offender score, even though the State had failed to support a comparability determination at sentencing. Because the State failed to meet its burden of proving the compatibility of out-of-state convictions before they could be included, the court held the sentence was "illegal or erroneous" and could be challenged for the first time on appeal. *Ford*, 137 Wn.2d at 484-85.

Here, the trial court ruled that the offense of rendering criminal assistance contains a single unit of prosecution consisting of a course of conduct. Based on this ruling, it ultimately instructed the jury on only one count of rendering for each defendant, and the jury convicted Eddie and Nelson of one rendering count each. On their judgment and sentences, the trial court listed and imposed sentence on only one rendering conviction each. In short, Eddie's and Nelson's judgments were entirely consistent with both the trial court's ruling and the jury's verdict.[12] Thus, unlike in *Moten* and *Ford*, in this case the appellants fail to demonstrate any error in their judgments warranting remand.

---

[12] Nelson argues, without citation to authority, that her judgment and sentence did not properly reflect the jury's verdict because "[t]he jury acquitted [her] of all of the 'means' which had originally been charged." Br. of Appellant at 20. Even if this court considered this argument without citation to authority, *see* RAP 10.3(a)(6), Nelson misstates the record. The jury returned a special verdict finding that Nelson had committed rendering through only one means which corresponded with count 7 as charged against her.

34

No. 41689-1-II (Cons. w/ No. 41714-6-II
   And No. 41739-1-II)

Further, even if we assume that the trial court actually dismissed the multiple rendering counts later submitted to the jury as one count with alternative means of commission, the appellants fail to cite any authority *requiring* the trial court to enter a written order of dismissal or note such dismissals on the judgments. Likewise, Douglas fails to cite any authority requiring the trial court, when it orally dismisses a count, to enter a written order or note the dismissal on the judgment. We ordinarily do not address assertions unsupported by argument or authority. *State v. Young*, 89 Wn.2d 613, 625, 574 P.2d 1171 (1978); *State v. Selander*, 65 Wn. App. 134, 136, 827 P.2d 1090 (1992); *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004), *abrogated in part on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *see also* RAP 10.3(a)(6).

Finally, the trial court did not err when it indicated on Nelson's judgment that it imposed an exceptional sentence on her rendering and possession of a stolen firearm convictions. The trial court imposed an exceptional sentence of 60 months on Nelson's first degree rendering conviction and a standard range sentence of 14 months on her possession of a stolen firearm conviction and ordered Nelson's sentences to run consecutively. RCW 9.94A.589(1) provides that, with exceptions, two or more current offenses shall be served concurrently, and RCW 9.94A.535 deems a departure from that standard to be an exceptional sentence. Thus, the trial court was correct in indicating that it imposed two exceptional sentences on Nelson.

IV.  STATEMENT OF ADDITIONAL GROUNDS (SAG)

In his SAG, Douglas argues that the trial court's instruction 35, the unanimity instruction regarding the special verdict forms, violated the rule in *State v. Bashaw*, 169 Wn.2d 133, 234 P.3d 195 (2010), *overruled by State v. Guzman Nuñez*, 174 Wn.2d 707, 285 P.3d 21 (2012).  He further contends that defense counsel was ineffective for failing to object to this instruction.

Instruction 35 provided:

> In order to answer a question on a special verdict form "yes," all twelve of you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer.  If you are not unanimously satisfied beyond a reasonable doubt that "yes'" is the correct answer, then fill in the blank on the special verdict with the word "no."
> Because this is a criminal case, each of you must agree for you to return a verdict.

CP at 447.

To begin with, this jury instruction actually complied with *Bashaw*'s requirements.  *See Guzman Nuñez*, 174 Wn.2d at 716-17.  Moreover, even if the instruction violated *Bashaw*'s nonunanimity rule, our Supreme Court rejected that rule and overruled *Bashaw* in *Guzman Nuñez*, 174 Wn.2d at 718.  The instruction was not erroneous, and defense counsel was neither deficient nor ineffective for not objecting to it.  A failure to demonstrate either deficient performance or prejudice defeats an ineffective assistance claim.  *See State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).  Therefore, this claim fails.

V.  SUMMARY OF DECISION

We hold that sufficient evidence supported Eddie's conviction for unlawful possession of a firearm and possession of a stolen firearm and Nelson's conviction for possession of a stolen firearm.  Sufficient evidence, however, did not support Douglas's convictions for unlawful possession of a firearm and possession of a stolen firearm.  The exceptional sentences imposed

36

under RCW 9.94A.535(3)(r) on Eddie's and Nelson's rendering of criminal assistance convictions were legally and factually justified. However, sufficient evidence did not support application of the aggravating circumstance of RCW 9.94A.535(3)(r) to Eddie's unlawful possession of a firearm and possession of a stolen firearm convictions or to Nelson's possession of a stolen firearm conviction. Further, the law enforcement victim aggravating factor under RCW 9.94A.535(3)(v) is legally inapplicable to Eddie's and Nelson's convictions for rendering criminal assistance and unlawful possession of a firearm, and sufficient evidence did not support applying the law enforcement victim aggravating factor to Eddie's and Nelson's possession of a stolen firearm convictions. Finally, the appellants did not demonstrate any error in their judgments or sentences regarding dismissed or consolidated counts, and the trial court's unanimity instruction was not erroneous.

Therefore, we affirm Eddie's and Nelson's convictions. We reverse Douglas's unlawful possession of a firearm and possession of a stolen firearm convictions and remand for dismissal of those convictions with prejudice. We also remand for resentencing of Eddie and Nelson consistently with this opinion.

BJORGEN, J.

I concur:

JOHANSON, ACJ

No. 41689-1-II (Cons. w/ No. 41714-6-II
And No. 41739-1-II)

QUINN-BRINTNALL, J. (dissenting in part) — While I concur with the majority of my colleagues' opinion, I write separately because I believe that there is sufficient evidence to support the jury's finding that Eddie Davis's and Latricia Nelson's convictions of possession of a stolen firearm were committed against a law enforcement officer. RCW 9.94A.535(3)(v).

The majority opinion states that although the victim of possession of a stolen firearm is the owner of the firearm, there was not sufficient evidence to support the jury's finding that the offense was aggravated by RCW 9.94A.535(3)(v). Under RCW 9.94A.535(3)(v), an offense is aggravated if "[t]he offense was committed against a law enforcement officer who was performing his or her official duties at the time of the offense, the offender knew that the victim was a law enforcement officer, and the victim's status as a law enforcement officer is not an element of the offense." The majority opines that because Officer Greg Richards was dead at the time Davis and Nelson possessed his firearm, he was not performing his official duties at the time of the offense; and, therefore, the aggravating factor does not apply. I cannot agree.

We should not interpret statutes in a manner that leads to absurd results. *State v. Snapp*, 119 Wn. App. 614, 626, 82 P.3d 252 (citing *In re Pers. Restraint of Brown*, 143 Wn.2d 431, 466, 21 P.3d 687 (2001)), *review denied*, 152 Wn.2d 1028 (2004). Under the majority's interpretation of RCW 9.94A.535(3)(v), a person could steal an officer's firearm and be guilty of aggravated possession of a stolen firearm while the officer is on-duty; however, as soon as the officer goes off-duty, the aggravating factor would apparently no longer apply to the possession of the stolen firearm. The legislature cannot possibly have intended to transform an aggravated offense into a nonaggravated offense simply because the victim officer is no longer on-duty. Therefore, I

38

cannot agree with the majority's interpretation of RCW 9.94A.535(3)(v) as it applies to possession of a firearm stolen from a law enforcement officer.

Under what I consider to be a more reasonable and workable interpretation of the statute, there is sufficient evidence to support the jury's finding that RCW 9.94A.535(3)(v) applied to Davis's and Nelson's possession of a stolen firearm conviction. For RCW 9.94A.535(3)(v) to apply, there has to be sufficient evidence to prove (1) the offense was committed against a law enforcement officer, (2) the officer was performing his or her duties at the time of the offense, (3) the offender knew the victim was a law enforcement officer, and (4) the victim's status as law enforcement officer is not an element of the offense. As the majority correctly points out, our Supreme Court has stated that the victim of possession of a stolen firearm is the owner of the firearm. *State v. Haddock*, 141 Wn.2d 103, 111, 3 P.3d 733 (2000). But the court goes on to explain that "the unlawful possession of property taken in a theft is a mere continuation of the thief's act of depriving the true owner of his or her right to possess their property." *Haddock*, 141 Wn.2d at 112. Following our Supreme Court's reasoning, the victim of possession of a stolen firearm is the same victim of the theft that originally deprived him or her of the firearm.

In my opinion, reading RCW 9.94A.535(3)(v), possession of a stolen firearm is committed against a law enforcement officer while in performance of his or her official duties if the original theft was committed against a law enforcement officer performing his or her official duties. *See Haddock*, 141 Wn.2d 112 (possession of a stolen firearm is a continuation of the original theft). Here, the firearm was stolen from Officer Richards, thus Officer Richards is the victim of both the theft and any resulting possession of the stolen firearm. It is undisputed that

39

Officer Richards was a law enforcement officer and that he was on-duty at the time of the theft.[13]

Therefore, the first two requirements of RCW 9.94A.535(3)(v) are met.

In this case, Davis and Nelson did not commit the original theft of the firearm. Therefore, there also has to be sufficient evidence to prove that Davis and Nelson knew that the victim was a law enforcement officer. Here, Cicely Clemmons testified that Maurice Clemmons stated, in Davis's and Nelson's presence, that he had killed four police officers and taken one of the officer's guns. This is sufficient evidence to prove that Davis and Nelson knew that the firearm was stolen from a law enforcement officer.

Finally, the victim's status as a law enforcement officer is not an element of possession of a stolen firearm. *See* RCW 9.41.040(1)(a). I believe that there is sufficient evidence to support the jury's finding that RCW 9.94A.535(3)(v) applied to Davis's and Nelson's possession of a stolen firearm convictions. Accordingly, I respectfully dissent from the portion of the majority opinion holding that there was insufficient evidence to support the jury's finding on RCW 9.94A.535(3)(v) and I would uphold the jury's verdict on that finding.

QUINN-BRINTNALL, J.

---

[13] Moreover, as the trial court noted, the weapon was Officer Richards's service revolver and also the property of the Lakewood Police Department.

40